Spring Steels, Inc., Appellant, *v.* Molloy.

Argued May 31, 1960. Before JONES, C. J., BELL, MUSMANNO, JONES, COHEN, BOK and EAGEN, JJ.

*Theodore Voorhees,* with him *Thomas C. McGrath, Jr.,* and *Barnes, Dechert, Price, Myers & Rhoads,* for appellant.

*George A. D'Angelo,* with him *Michael C. McManus,* for appellees.

Opinion by Mr. Justice Musmanno, June 29, 1960:

Spring Steels, Inc. deals in spring steels, as its name would at least suggest. It maintains an establishment at York and Philips Streets in Philadelphia where it cuts and edges already manufactured spring steel to its customers' specifications.

On March 11, 1958, a competing corporation, entitled Industrial Spring Steel, Inc., came into being and later went into business at 115 West Huntington Street, only four blocks away from the Spring Steels warehouse. The president of the new company, Peter Molloy, had been, until October 3, 1958, the vice-president of Spring Steels. On that day he left that company, taking with him four of its key employees: salesman, shop foreman, warehouseman, and office manager.

Spring Steels brought an action in equity in the Court of Common Pleas No. 2 of Philadelphia County against Industrial Spring Steel and its five former employees, charging unfair competition and averring specifically that the new company was using the plaintiff's customers list; that it was making use of the knowledge and skill gained by the two defendants Petrilla and Forte who had been machinists with the plaintiff company; that it was operating a cutting and filing machine patterned after a similar machine used by the plaintiff corporation; and, in doing so, was making unlawful use of a trade secret; and that it had adopted a corporate name which was deceptively similar to the plaintiff's name. The plaintiff prayed the Court to enjoin the defendants from continuing their operation and to assess damages for losses allegedly sustained by the plaintiff.

The defendants filed answer, denying the pertinent averments, and the case went to trial. After the taking of extensive testimony the chancellor dismissed the

complaint and entered a decree nisi. Exceptions were filed and argued and the decree made final. The plaintiff has appealed.

It is the contention of the plaintiff company that the individual defendants, while still its employees, conspired to effect an organization which would cripple and perhaps wreck Spring Steels, Inc. Whatever may be the principle of ethics involved, in the act of employees planning to set up a rival organization to the one to which they at present owe economic fealty, is not in issue here. Certainly from a philosophical point of view one might well wish that employees give full-hearted and undeviating allegiance to the organization which puts the bread on their table, but, on the other hand, there is no reason why employees, as free agents, should not attempt to better their lot economically when they see a way to do so, consonant with law and integrity.

Perhaps the moral position of the defendants would have been improved if they had left the ship of their current employment as soon as they began to lay the keel for the ship which was to offer not only competition but possible shipwreck to the vessel of their original allegiance. But, be that as it may, the employees were free employees. They were not under contract with the plaintiff company. The company could discharge them at any time they chose, and, returning like for like, the defendants were equally free to part company with their employer when it should please them so to do.

This does not mean, however, that an employee, departing from his employer's establishment, may take with him anything which, in law, belongs to the employer. The plaintiff company here charges that the defendants took with them its customers list and is now using that list to the plaintiff's considerable dis-

advantage. The appellant cites, in support of its position in this connection, the case of *Morgan's Home Equipment Corporation v. Martucci,* 390 Pa. 618, where we said: "In many businesses, permanent and exclusive relationships are established between customers and salesmen. The customer lists and customer information which have been compiled by such firms represent a material investment of employers' time and money. This information is highly confidential and constitutes a valuable asset. Such data has been held to be property in the nature of a 'trade secret' for which an employer is entitled to protection, independent of a non-disclosure contract, either under the law of agency or under the law of unfair trade practices."

This is, of course, good law, but it is not applicable in the case at bar because the customer lists here involved were not the product of any special work on the part of the plaintiff company, nor were they confidential. The defendant, Joseph Kerschbaum, who was particularly charged by the plaintiff with illegal use of customer lists, had been a salesman for Spring Steels, Inc., for eight years, but prior to this employment he had been a general steel salesman for from ten to twelve years, during which time he had prepared his own list of all types of steel users in the Philadelphia area. It is true that while in the employ of the plaintiff company he had added to this original list, but the additions were not gained through any confidential sources of the plaintiff company. On the contrary, as the chancellor properly found from the evidence in the case: "The bulk of the additions made by defendant Kerschbaum during the course of his employment by plaintiff came from information contained in trade journals and ordinary listings in the telephone directory."

On this subject of customers lists, the Circuit Court of Appeals for the Third Circuit said, in *Wiegand Co. v. Trent Co.*, 122 F. 2d 920: "The rule is quite clear that the solicitation of customers and use of customers lists is permissible unless there is a breach of an express contract or violation of some confidence. *There must be some element of fraud or trade secrecy involved. . .*

". . . 'But equity is not protecting mere names and addresses easily ascertainable by observation or by reference to directories.' " (Emphasis supplied)

The plaintiff also contends that the defendants purloined one of its secret trade processes. The company president, Ralph W. Shaw, Jr. testified that, with the assistance of others, he had developed a process for filing the edges of tempered spring steel and that a machine was built to do this work. The plaintiff's brief asserts: "After experiments with the special machines, the process was perfected for the harder metal, and Mr. Shaw testified without contradiction that when installed, the two machines were the first and only such installations until Industrial Spring Steel obtained a similar machine and commenced processing tempered spring steel in the same manner. Molloy admitted that he had acquired a similar filing machine and was using it to file the edges of tempered spring steel though he claimed that he had made changes in the equipment."

But the chancellor found, and justifiably so, that the plaintiff had no legal claim to the process under discussion, that it had been first developed by John A. Roebling and Sons, a New Jersey corporation, that the machine had never been patented by either the plaintiff or Roebling and was thus available to any processors or users in the steel trade. It is true, the chancellor also found, that two of the defendants, who had been employees of the plaintiff, had "developed a process for the edging of tempered steel by the use of the

filing or cutting machines. However, this process is neither exclusive, secret or confidential."

We held in *Pittsburgh Cut Wire Co. v. Sufrin,* 350 Pa. 31, 34: "The burden was on the plaintiff to show it held a trade secret and the defendants had misappropriated it in violation of a confidential relationship. There being no evidence of a trade secret in the construction or operation of this machine, and Bradley not being enjoined or having agreed not to reveal any alleged trade secret of the plaintiff in connection therewith when he quit the service of the plaintiff, the experience, knowledge, memory, and skill, which he gained while there employed, he had a right to use to his own advantage . . . The record further discloses that no secrecy was enjoined, either by contract or warning, on the employees of the plaintiff, either in the production or subsequent use of the Gem Paper Clip machine, nor were there any circumstances that would indicate to an employee such a confidential relationship existing under his contract of employment as would cause the employee to be charged with the fact that the Gem Paper Clip machine or any of its parts were trade secrets of the plaintiff. *A man's aptitude, his skill, his dexterity, his manual and mental ability, and such other subjective knowledge as he obtains while in the course of his employment, are not the property of his employer and the right to use and expand these powers remains his property unless curtailed through some restrictive covenant entered into with the employer.*" (Emphasis supplied.)

And then, the plaintiff urges upon us that the use by the defendants of the name Industrial Spring Steel constitutes unfair competition because the name is substantially similar to that of the plaintiff's and was purposely designed to confuse the plaintiff's customers. The record does not prove that the defendants endeavored

with guile and cunning to pick a name which would take the plaintiff's customers to the defendants' doors. It is only natural that they would want to use the generic word "steel" in the name of their company if the name was at all to be descriptive of their business. They originally sought permission from the Department of State of the Commonwealth of Pennsylvania for authority to use the name "Specialty Steels", and it was only when this name was unobtainable that they adopted the title "Industrial Spring Steel, Incorporated."

In disposing of this part of the case, the chancellor called attention to the fact that the first word of the defendant's title is "Industrial" and that it is by this term that the defendant corporation is generally referred to, "thus providing a basis for distinguishing the two companies." In fact, the chancellor observed, that during the trial of the cause, the plaintiff's attorney often referred to the defendant corporation as "Industrial." We approve of the chancellor's conclusion that the "plaintiff has failed to sustain its burden of proving actual confusion between the two names, acquisition of a secondary meaning or an inherent similarity which would be confusing to the average customer. While not utilized as a determinative in this question, it should be noted that the bulk of the customers of the two corporations are industrial steel users and hence far less likely to be confused than ordinary members of the public."

The plaintiff submits with emphasis that it is not enough to decide this case on the separate points involved. Steel Springs, Inc. insists that it is entitled to a decision "on the basis of the overall conduct of the defendants" as well as on the separate alleged illegalities. The plaintiff sees in the action of its former employees a conspiracy to cripple its business, a con-

spiracy which should not receive the sanction of any court. It argues particularly that Peter Molloy, its former vice-president, "conceived the idea of a new competing business, persuaded the other defendants to go along with him by promises and other means and conceived the plan of resigning in a group."

But, as already stated, there was no formal contract of employment between the plaintiff company and Molloy. To enjoin Molloy from forming an independent business enterprise with his own associates would, under the circumstances of this case, be violative of the spirit of free competitive enterprise in America. In order to bind Molloy permanently to its firm, the plaintiff company would have had to offer some special consideration to him for surrendering what was his inalienable right to determine for himself what should be his future career. It was within the range of foreseeability for the plaintiff to realize that some day Molloy might want to seek other pastures. There invariably comes the time when the employee leaves his employer, the apprentice leaves his master, the student leaves his tutor and the son leaves his father. To hold the employee, apprentice, student or son beyond the period of natural legal emancipation, a quid pro quo is required. There was no quid pro quo in the case at bar.

To enjoin a former employee from entering into such employment as he wishes is in the nature of a restraint on one's liberty. Such restraint may be in order depending on circumstances which are not present in this case. As Justice COHEN said in the case of *Wexler v. Greenberg*, 399 Pa. 569, 576: "Where, however, an employer has no legally protectable trade secret, an employee's 'aptitude, his skill, his dexterity, his manual and mental ability, and such other subjective knowledge as he obtains while in the course of his employ-

ment are not the property of his employer and the right to use and expand these powers remains his property unless curtailed through some restrictive covenant entered into with the employer.' [*Wire Co. v. Sufrin,* 350 Pa. 31, 35.] The employer thus has the burden of showing two things: (1) 'a legally protectable trade secret; and (2) a legal basis, either a covenant or a confidential relationship, upon which to predicate relief."

Comment e of Section 393 of the Restatement (2d), Agency, is particularly relevant and significant when applied to the facts in this case: "After the termination of his agency, in the absence of a restrictive agreement, the agent can properly compete with his principal as to matters for which he has been employed. See Sec. 396. Even before the termination of the agency, he is entitled to make arrangements to compete, except that he cannot properly use confidential information peculiar to his employer's business and acquired therein. Thus, before the end of his employment, he can properly purchase a rival business and upon termination of employment immediately compete . . ."

Nor is the fact that the new company may acquire some of the plaintiff's former customers contrary to law. It is not a phenomenal thing in American business life to see an employee, after a long period of service, leave his employment and start a business of his own or in association with others. And it is inevitable in such a situation, where the former employee has dealt with customers on a personal basis that some of those customers will want to continue to deal with him in his new association. This is so natural, logical and part of human fellowship, that an employer who fears this kind of future competition must protect himself by a preventive contract with his employee, unless, of course, there develops a confidential relationship which of itself speaks for non-disclosure and non-competition

in the event the employer and employee separate. There is nothing of that in this case.

Nor is there any evidence that any of the defendants has engaged in fraud, deception or artifice, that he is violating any confidence acquired in his employment, or that he is making use of any trade secret acquired during the time he was employed by the plaintiffs. With a record of that kind before the chancellor, whose adjudication was affirmed by the court en banc, no decision other than the one rendered was possible.

The record does not reveal that the defendants collectively or individually, have violated any property right of the plaintiffs. In *Horowitz Co. v. Cooper*, 352 Pa. 7, several officials of the plaintiff company left the company and joined with others to form a new business. The plaintiff company attempted to enjoin their former officials from carrying on their enterprise. The court refused an injunction, and this Court, in affirming the decision, approved of the following language in the lower court's opinion: "The weakness of the plaintiff's case is that there is no averment or proof of any substantial appropriation of any property right of the plaintiff. The plaintiff has failed to show a right to enjoin the defendants, which is clear both on the law and the facts, or that it is necessary to maintain the status quo in order to avoid the danger of irreparable injury to its business or physical property. There is no proof that the defendants have done anything to establish an unfair competitive business, in that the defendants' action consists of any fraud or deception in its dealings with third parties or consumers. The plaintiff has not cited any law to support its contention that employes who desire to leave the employ of the plaintiff for any reason whatever, which would prohibit their employment by the defendants."

Decree affirmed, costs on appellant.