J-A20015-16

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| LAURIE A. JOSEPH | IN THE SUPERIOR COURT OF PENNSYLVANIA |
|---|---|
| v. | |
| JOHN B. O'LAUGHLIN, | |
| Appellant | No. 1706 WDA 2015 |

Appeal from the Order September 30, 2015
In the Court of Common Pleas of Fayette County
Civil Division at No(s): 1691 of 2015 G.D.

BEFORE: BOWES, STABILE AND MUSMANNO, JJ.

MEMORANDUM BY MUSMANNO, J.:                    **FILED AUGUST 22, 2017**

John B. O'Laughlin ("O'Laughlin") appeals from the trial court's Order permanently enjoining O'Laughlin from engaging in activities related to the future operation of a veterinary clinic within a fifty mile radius of the Grace Veterinary Clinic, Inc. ("Grace Veterinary Clinic"),[1] which is owned by Laurie Joseph ("Joseph"). We affirm.

On December 23, 2014, O'Laughlin and Joseph executed an asset transfer agreement ("the Agreement") outlining Joseph's purchase of the Grace Veterinary Clinic. The Agreement included the following restrictive covenant:

> [O'Laughlin] acknowledges and agrees that he will not be involved in any of the following activities at any location within fifty (50) miles of the veterinary clinic ("Geographic Area"). [O'Laughlin] covenants and agrees that for a period of five (5)

---

[1] Grace Veterinary Clinic is located at 1565 Route 31 in Westmoreland County, Pennsylvania.

years following the execution of this Agreement, he shall not directly or indirectly, as an employer, employee, principal, agent, consultant, partner, stockholder, creditor or in any other capacity, engage or participate in any business or practice within the Geographic Area that is in competition in any manner whatsoever with the Buyer. Further, [O'Laughlin] shall not contact, solicit, or engage in any activity to contact or solicit, indirectly or directly, any client, past, present, or future, during that five (5) year period.

Agreement, 12/24/14, ¶ 3 (at unnumbered page 3). The restrictive covenant, which expires on December 24, 2019, comprised $17,973.50 of the $750,000 sale price.[2] *Id*. at ¶ 4.

Approximately six months later, on July 2, 2015, O'Laughlin filed a Petition for Special Exemption with the Fayette County Zoning Hearing Board, wherein he requested permissive use to operate a veterinary clinic at 114 Eannotti Road, Dawson Pennsylvania, which is approximately eight miles from the Grace Veterinary Clinic. The zoning hearing was scheduled for August 26, 2015. Meanwhile, O'Laughlin formed a limited liability company (O'Laughlin Veterinary Services), created a Facebook page of the same name, and purchased equipment. The Facebook page included a link that advised followers that the clinic was, "coming soon," and when activated, the link directed users to the business's location on a map.

---

[2] Each of the remaining intangible assets involved in the sale, *i.e.*, goodwill, use of the brand name for six months, and customer base, were also valued at $17,973.50. **See** Agreement, ¶ 3 (at unnumbered page 3).

On August 25, 2015, Joseph filed an action for injunctive relief, seeking to enforce the Agreement's restrictive covenant. Specifically, Joseph sought to permanently enjoin O'Laughlin from operating a veterinary clinic and prohibit him from seeking the zoning variance that was scheduled for a hearing the following day. On the same date, Joseph filed a self-styled Motion for Preliminary/Permanent Injunction requesting the identical relief.

On August 27, 2015, the trial court entered a preliminary injunction against O'Laughlin, ordering him to "cease and desist any veterinary operations at … 114 Eannotti Road," and suspending the zoning hearing pending disposition of the permanent injunction action. Thereafter, following an evidentiary hearing, the trial court entered the permanent injunction at issue in this appeal. Specifically, the court prohibited O'Laughlin from operating a veterinary clinic within fifty miles of Grace Veterinary Clinic, canceled the zoning hearing, dismissed O'Laughlin's petition for a special exemption, directed O'Laughlin to cease operations at the 114 Eannotti Road facility, and enjoined O'Laughlin "from engaging in any activity that would violate the [] Agreement[.]" Trial Court Order, 9/30/15, at 2. Thereafter, O'Laughlin filed the instant timely appeal, followed by a court-ordered Pa.R.A.P. 1925(b) Concise Statement of matters complained of on appeal.[3]

_____

[3] O'Laughlin initially leveled three claims; however, he filed an Amended Concise Statement, which included an additional claim.

O'Laughlin presents the following claims for our review:

1.    Did the [trial] court err in entering the permanent injunction order in favor of [Joseph] by citing to and relying upon as precedential authority in its opinion an unpublished memorandum decision of the Pennsylvania Superior Court.

2.    Did the [trial] court err in entering the permanent injunction order when the prerequisite legal elements for the issuance of such an injunction [were never established]?

3.    Did the [trial] court err in entering the permanent injunction order in favor of [Joseph,] based on proof of [O'Laughlin's] preliminary actions in preparing to compete against [Joseph] at a future point in time?

4.    Did the [trial] court err in entering the permanent injunction order in favor of [Joseph] as the order exceeded the scope of the proof advanced by [Joseph] at the permanent injunction hearing?

Brief of Appellant at 4 (issues renumbered for ease of disposition).

O'Laughlin first claims that the trial court erred in relying upon this Court's unpublished decision in ***Atkinson & Mullen Travel, Inc., et al. v. O'Brien, et al***, 2944 EDA 2012 (Pa. Super. filed May 5, 2014) (unpublished memorandum), as authoritative precedent in rendering its decision.  In that case, we inferred a need, in light of that appellant's past litigiousness, for a permanent injunction to prevent the appellant from engaging in serial litigation against a defendant, even though no lawsuit was pending. Presently, the trial court relied upon our discussion in the unpublished memorandum to support its analogous rationale that O'Laughlin's preparations violated the restrictive covenant because "it [was] improbable that [O'Laughlin] took all of the aforementioned actions so that he could be

ready to compete on December 24th, 2019, and not before." Trial Court Opinion, 9/30/15, at 5.

As O'Laughlin accurately observes, Superior Court Internal Operating Procedure § 65.37 precludes any court or party from citing or relying upon an unpublished memorandum decision except in limited situations that are not implicated in this case. Specifically, the proviso states,

> A. An unpublished memorandum decision shall not be relied upon or cited by a Court or a party in any other action or proceeding, except that such a memorandum decision may be relied upon or cited (1) when it is relevant under the doctrine of law of the case, *res judicata*, or collateral estoppel, and (2) when the memorandum is relevant to a criminal action or proceeding because it recites issues raised and reasons for a decision affecting the same defendant in a prior action or proceeding. When an unpublished memorandum is relied upon pursuant to this rule, a copy of the memorandum must be furnished to the other party to the Court.

Superior Court IOP § 65.37(A).

Here, the trial court relied upon our legal analysis in the unrelated unpublished memorandum in order to draw the inference that O'Laughlin's preparations threatened Joseph with a substantial injury. Accordingly, we agree with O'Laughlin that the trial court erred in relying upon that analysis as having any precedential value.[4] However, we reject O'Laughlin's

_____

[4] We observe that our Supreme Court is currently considering a proposal from the Appellate Court Procedural Rules Committee that would permit citation to unpublished memorandum as persuasive authority. Nevertheless, as of the date of this Opinion, our Supreme Court has not endorsed the
*(Footnote Continued Next Page)*

concomitant assertion that the misstep is tantamount to reversible error. To the contrary, for the reasons explained *infra*, we conclude that the certified record supports the trial court's imposition of a permanent injunction.

We review an order granting permanent injunctive relief *de novo* and our scope of review is plenary. ***Kuznik v. Westmoreland County Bd. of Comm'rs***, 902 A.2d 476, 489 (Pa. 2006). "To justify the award of a permanent injunction, the party seeking relief must establish that his right to relief is clear, that an injunction is necessary to avoid an injury that cannot be compensated by damages, and that greater injury will result from refusing rather than granting the relief requested." ***Id***. (citations and internal quotation marks omitted). Additionally, "[u]nlike a preliminary injunction, a permanent injunction does not require proof of immediate irreparable harm." ***Liberty Place Retail Assocs., L.P. v. Israelite School of Universal Practical Knowledge***, 102 A.3d 501, 506 (Pa. Super. 2014).

We address O'Laughlin's next two claims together. First, O'Laughlin challenges the trial court's determination that Joseph established the three components of a permanent injunction. Brief for Appellant at 11. Specifically, he asserts that at the hearing, Joseph did not adduce evidence establishing a clear right to relief, insofar as O'Laughlin's actions did not constitute a violation of the restrictive covenant. ***Id.*** at 12. The crux of this

*(Footnote Continued)* _____

proposed rule or promulgated an amendment that would sanction the trial court's citation to our unpublished memorandum decision in this situation.

- 6 -

contention is that O'Laughlin's activities did not constitute engaging in a competing business or soliciting potential clients. *Id.* at 12-13.

O'Laughlin highlights that he did not operate a veterinary clinic within the prohibited area, and asserts that the only evidence of his alleged violation was the creation of the Facebook page, and the petition he filed with the zoning board for a special exemption to operate a veterinary facility. *Id.* at 13. Framing these actions as merely "preparatory," O'Laughlin contends that no evidence exists of his present intention of opening a veterinary clinic on the site in violations of the restrictive covenant. *Id*. O'Laughlin continues, "even if he had such present intention it would be several years before that intention would manifest itself in actual competition . . . with Joseph." *Id*. Hence, he concludes that the record does not sustain the trial court's finding of a clear right to relief. *Id.* at 13-14.

The second aspect of this argument assails the portion of the trial court's rationale that anticipates a breach of the restrictive covenant based upon O'Laughlin's "very preliminary efforts" to compete with Joseph at some undisclosed point in the future. *Id*. at 15. O'Laughlin relies upon a mixture of persuasive authority, including the Restatement (Second) of Agency, and cases from various sister jurisdictions that address an employee's duty of loyalty to his employer in the absence of a restrictive covenant. O'Laughlin highlights that, in those fact-sensitive cases, the various jurisdictions have

determined that incorporating a business, registering a trademark, purchasing equipment, and obtaining office space, bank account, and telephone listings were permissible preparatory measures. *Id.* at 16. In contrast to covenants not to compete in employment contracts, a restrictive covenant included in an agreement for the sale of an established business are intended to temporarily limit a seller's competition with a purchaser, in order for the purchaser to establish its own cliental:

> General covenants not to compete which are ancillary to the sale of a business serve a useful economic function; they protect the asset known as 'good will' which the purchaser has bought. Indeed, in many businesses it is the name, reputation for service, reliability, and the trade secrets of the seller rather than the physical assets which constitute the inducements for a sale. Were the seller free to re-enter the market, the buyer would be left holding the proverbial empty poke.

*Id*. Consistent with our Supreme Court's perspective, we review the restrictive covenant in the present case with an eye toward ensuring that both sides to the asset transfer agreement obtain the benefit of their bargain.

In the instant case, the specific language of the Agreement provided that O'Laughlin

> **shall not directly or indirectly**, as an employer, employee, principal, agent, consultant, partner, stockholder, creditor or in any other capacity, **engage or participate in any business or practice** within the Geographic Area that is in competition … with the Buyer. Further, [O'Laughlin] shall not contract, solicit, or engage in any activity to contact or solicit, indirectly or directly, any client, past present, or future, during that five (5) year period.

Agreement, ¶ 3 (emphasis added). The trial court determined O'Laughlin was "preparing to violate the non-compete [A]greement]," when he

    1. Created a limited liability company with the name "O' Laughlin Veterinary Services;"

    2. Purchased Equipment;

    3. Created, or had created on his behalf, a Facebook page with the name "O' Laughlin Veterinary Services;"

    4. Indicated on the Facebook page that the clinic was "Coming Soon;"

    5. Applied for a special exception permit;

    6. Stated that the intended use of his property was for a "veterinary clinic;" and

    7. Proposed to locate said veterinary clinic less than nine (9) miles from Grace Veterinary Clinic, well within the fifty (50) mile prohibited radius.

Trial Court Opinion, 9/30/15, at 4. Consequently, the trial court concluded that Joseph had satisfied the threshold element of a permanent injunction, *i.e.* a clear right to relief. ***See id.***

    Our review of the record discloses that the restrictive covenant at issue was not limited to O'Laughlin's practice of veterinary medicine. By its plain language, the restrictive covenant barred O'Laughlin from, "**directly or indirectly**" "**engag[ing] or participat[ing] in any business**" in competition with Appellee's business within the Geographic Area. Agreement, ¶ 3 (emphasis added). O'Laughlin's creation of a limited liability company, purchasing equipment, and seeking a special exception zoning

permit are all integral parts of "engag[ing] or participat[ing]" in the business of operating a competing veterinary clinic, within the Geographic area. **See id.** As such, they were patently prohibited by the Agreement's restrictive covenant.

O'Laughlin's reliance upon case law regarding an employee's duty of loyalty to an employer is not particularly helpful.[5] Generally, covenants not to compete, which are ancillary to employment contracts, are subjected to a higher scrutiny than their counterparts that supplement the sale of a business. **Morgan's Home Equipment Corp. v. Marticci**, 136 A.2d 838, 846 (Pa. 1957). In **Spring Steels, Inc. v. Molloy**, 162 A.2d 370 (Pa. 1960), our Supreme Court observed that, *absent a restrictive agreement*, an employee may make preparations to compete before the end of his employment, and not breach his/her fiduciary duty of loyalty. **Id.** at 375. Other jurisdictions have similarly recognized that preparations to compete may violate an employee's duty of loyalty, where there exists a restrictive covenant.

For example, the United States Court for the Eastern District of Pennsylvania has explained that,

> where an employee, **bound by a restrictive covenant**, makes preparations to compete with his current employer, the

_____

[5] We reject O'Laughlin's reference to agency law summarily, as those tenets are entirely inapplicable to the case at bar.

> employee could be said to have breached his duty of loyalty by seeking employment with admitted competitors of the employer while still employed because the results of the employees' activities could be construed as contrary to the express interests of employer.

*Synthes, Inc. v. Emerge Med., Inc.*, 25 F. Supp. 3d 617, 667-68 (E.D. Pa. 2014) (emphasis added). *See also Mattern & Assocs., L.L.C. v. Seidel*, 678 F. Supp. 2d 256, 268 n.10 (D. Del. 2010) (noting that preparations to compete, which would not be actionable under a breach of fiduciary duty theory, may be actionable where an employee is bound by a restrictive covenant); *Sales & Mktg., Inc. v. Menaged*, No. Civ.A.97-4966, 1998 U.S. Dist. LEXIS 14008, 1998 WL 575270, at *7 (E.D. Pa. Sept. 9, 1998) (recognizing that "Defendants were at-will employees *and were not subject to any covenants not to compete with Plaintiff* once they left the company, so their formation of a competing company, and even the steps they took to form the company while still employed by L&N, was not illegal.") (emphasis added). Thus, preparations to compete may be barred by an employee's duty of loyalty, where there exists a restrictive covenant. As a result, we are not persuaded by O'Laughlin's reliance upon employment cases.

O'Laughlin also directs our attention to *Berardi's Fresh Roast*, *Inc. v. PMD Enter.*, *Inc.* 2008 Ohio App. Lexis 4618 (Ohio Ct. App. 2008), a case from a sister jurisdiction, as support for his position that his

- 11 -

preparatory measures did not breach the sales agreement.[6]   In ***Berardi's***

***Fresh Roast***, the seller had "entered into a noncompetition agreement

which prevented him from re-entering the coffee industry for three years."[7]

***Id.*** at *3.   The Ohio appellate court determined that the seller did not

violate the noncompetition agreement when he organized a new coffee

roasting enterprise, investigated finance options, leased warehouse space,

hired employees, and ordered equipment and supplies prior to the expiration

of the noncompetition agreement.  ***Id.*** at *13.  In so holding, the Ohio court

distinguished between preparing to compete, and actual competition.  ***Id.*** at

*13-*14.  We cannot conclude that this case is supportive of O'Laughlin's

position, where the restrictive covenant at issue is not set forth in the

decision.

In this case, the record reflects that O'Laughlin formed a limited

liability company styled, "O'Laughlin Veterinary Services," acquired medical

_____

[6]   The Court of Appeals for Ohio permits citation to and reliance upon its unpublished cases filed after May 1, Specifically, the Ohio Supreme Court Rules for the Reporting of Opinions provides that

> [a]ll opinions of the courts of appeals issued after May 1, 2002 may be cited as legal authority and weighted as deemed appropriate by the courts without regard to whether the opinion was published or in what form it was published.

Rep.Op.R. 3.4.

[7] The text of the noncompetition agreement is not set forth in the Court of Appeals' decision.

equipment, purchased real estate, and applied for a special use zoning exception that would permit him to build and use a facility as a veterinary clinic.  By these actions, O'Laughlin "**directly or indirectly**" "**engag[ed] or participat[ed] in any business**" in competition with Joseph's business, within the Geographic Area.  *See* Agreement,  ¶ 3.  These actions were a clear violation of the restrictive covenant, and evince a clear right to relief as to that aspect of a permanent injunction.

We next address O'Laughlin's solicitation of customers through social media.  As the trial court observed, O'Laughlin created a Facebook page under the name O'Laughlin Veterinary Services and maintained contact with former clients of Grace Veterinary Clinic.  Trial Court Opinion, 9/30/15, at 2-3.   We conclude that O'Laughlin's action in this regard violated the restrictive covenant set forth in the Agreement.

As noted *supra*, the final proviso in the non-compete clause stated that "[O'Laughlin] shall not contact, solicit, or engage in any activity to contact or solicit, indirectly or directly, any client, past, present, or future, during [the] five (5) year period."  Asset Transfer Agreement, ¶ 3; Appellee's Exhibit A. O'Laughlin operated a Facebook page under the name O'Laughlin Veterinary Services.  Joseph testified that she visited the Facebook page after a client informed her about O'Laughlin's then-pending zoning petition.   Joseph described the page and explained how the "Coming Soon" banner directed her to a website that provided a map and written driving directions from a

given point to O'Laughlin Veterinary Services at the address identified in the zoning petition. N.T., 9/24/15, at 60-61, 66.

The O'Laughlin Veterinary Services page on Facebook utilized the URL https://www.facebook.com/DrOlaughlin and indicated that it was affiliated with the American Veterinary Medical Association. The home page invited viewers "to connect with O'Laughlin Veterinary Services." *See* Appellee's Exhibit G (O'Laughlin's Facebook posts between 7/16/15 and 9/23/15). Through the social media page, O'Laughlin shared various animal-related links, images, and posts with former clients, other practitioners, and entities involved in pet care and animal nutrition. As it relates to the present issue, O'Laughlin's interactions with some of his former clients require further examination.

On September 5, 2015, Kay Clark, a former client who was active on the Facebook page, commented that O'Laughlin was the "[o]nly vet I have ever taken my [pets] to" and "hopefully [he is] back soon." Exhibit G at 28. Approximately two weeks later, O'Laughlin posed the cryptic query, "Guess who else will be text updating [*sic*] owners??? … It starts with an O'[.]" *Id*. at 17. Three days later, on September 20, 2015, another client expressed, "[O'Laughlin] is a supper [*sic*] great Vet" and "[Can't] wait for the **new clinic to open**." *Id*. at 18 (emphasis added). Thus, nine months from the date the parties executed the Agreement, and more than four years and three months before the restrictive convenient expired, O'Laughlin was

actively contacting former clients and indirectly soliciting their business in anticipation of opening his new clinic.

We reject O'Laughlin's assertion that Joseph conceded "that the Facebook page in no way constituted an advertisement for veterinary services or a solicitation of veterinary services customers by O'Laughlin." Brief of Appellant at 13. The contention is factually inaccurate. In reality, to the extent that Joseph offered any concessions, it was that the Facebook page did not indicate that O'Laughlin was registering new patients or accepting clients. *See* N.T., 9/24/15, at 79. Thus, O'Laughlin's perception of the purported concession is skewed. More importantly, notwithstanding O'Laughlin's mischaracterization, the fifty-six page exhibit that memorialized the three months of entries on the O'Laughlin Veterinary Services Facebook page speaks for itself.

Upon review of that document, it is obvious that, collectively, the posts, "coming soon" announcement, and map directions, are tantamount to a solicitation of past or future clients in contravention of the non-compete clause. The resounding purpose of the Facebook page, and the attendant communications therein, was to inform the followers of the page, including former clients, that he intended to open a new clinic and to keep them apprised of his progress. There is but one reason for O'Laughlin to create the O'Laughlin Veterinary Services Facebook page and maintain contact with former clients: to solicit their business

Further, despite O'Laughlin's protestations to the contrary, the fact that Joseph only rented use of the brand name for six months does not alter our analysis. As enumerated in the agreement, the temporary use of the brand name is a distinct component of the agreement with consideration separate and apart from the restrictive covenant. Although Joseph's exclusive use of the brand name expired during June 2015, O'Laughlin's contractual obligations and the remaining intangible assets endured. Thus, O'Laughlin's argument that the expiration of the six months somehow affected his contractual obligation to abstain from solicitation pursuant to the restrictive covenant is unpersuasive.

As O'Laughlin's continued public discourse with his former clients under the banner of O'Laughlin Veterinary Services is an express violation of the restrictive covenant, we conclude that Joseph demonstrated a clear right to relief in this regard and, on this basis, we affirm the portion of the trial court's permanent injunction relating to O'Laughlin's operation of the O'Laughlin Veterinary Services' Facebook page. *See Braun v. Wal-Mart Stores, Inc.*, 24 A.3d 875, 892 (Pa. Super. 2011) (Superior Court may affirm on any basis supported by the record).

Having found a clear right to relief, we address the remaining elements of Joseph's request for a permanent injunction, *i.e.*, (1) the absence of an adequate remedy at law; and (2) that the greater injury will result from refusing injunctive relief. Beyond the conclusory statement that,

"the Lower Court erred in its conclusion that the recited elements for a permanent injunction [regarding an actual and substantial injury] had been established through the record proof," O'Laughlin does not challenge the second element of the decision to grant a permanent injunction. Brief of Appellant at 12. O'Laughlin's argument relating to the final element of Joseph's claim is only slightly more developed. In sum, O'Laughlin contends that the trial court failed to balance the respective harms to the parties. *Id.* at 14.

In light of O'Laughlin's failure to level comprehensive legal arguments addressing either of these components, both assertions are waived. *See In re W.H.*, 25 A.3d 330, 339 n.3 (Pa. Super. 2011) (quoting *In re A.C.,* 991 A.2d 884, 897 (Pa. Super. 2010), and stating that, "where an appellate brief fails to provide any discussion of a claim with citation to relevant authority or fails to develop the issue in any other meaningful fashion capable of review, that claim is waived."). Moreover, even assuming that O'Laughlin's cursory arguments are reviewable, no relief is due.

O'Laughlin's bare claims not only are wholly insufficient, but they also mischaracterize the record. In order to establish this aspect of her request for a permanent injunction, Joseph was required to demonstrate that "actual and substantial injury **is likely in the future**." *Peugeot Motors of America, Inc. v. Stout*, 456 A.2d 1002, 1008 (Pa.Super. 1983) (emphasis added). Notwithstanding O'Laughlin's contention, the certified record

demonstrates that Joseph is likely to be harmed by O'Laughlin's unobstructed actions and solicitation of her clients, whether direct or indirect. Recall that Joseph had a bargained-for-expectation of those clients because she paid O'Laughlin $53,920.50 to acquire the goodwill and client list for Grace Veterinary Clinic, and for O'Laughlin's promise to forego contacting or soliciting past, present, and future clients. Thus, having received compensation for his noninterference with his former customers, it would be incongruous to permit O'Laughlin to spend the ensuing five years soliciting those clients on Facebook in anticipation of opening a rival clinic after the restrictive covenant expired. In sum, Joseph demonstrated that substantial injury is likely if O'Laughlin is not enjoined from directly or indirectly soliciting clients.

For a similar reason, we reject O'Laughlin's complaint that the trial court did not weigh the respective injuries associated with granting and denying the requested relief. In addition to being waived as woefully underdeveloped, **see In re W.H.**, **supra**, at 339 n.3, we observe that the greater injury to Joseph in the absence of injunctive relief is obvious. Unlike O'Laughlin's purely preparatory measures that we outlined *supra*, competent evidence exists in the certified record to establish O'Laughlin's solicitation of the former clients of Grace Veterinary Clinic. The sample of the comments posted on the O'Laughlin Veterinary Clinic Facebook page by O'Laughlin's former clients are revealing. The clients affirmed their allegiance to

O'Laughlin notwithstanding his absence by stating "hopefully [he is] back soon" and declaring "[Cant'] wait for the new clinic to open." Exhibit G at 18, 28. Moreover, O'Laughlin further enticed his former clients with his own esoteric post referencing an anticipated text message that he intended to send to pet owners about an unsaid event. *Id*. at 17. In contrast to O'Laughlin's benign measures to ready a prospective business, his pervasive contact with former clients on social media since July 2015 and his indirect solicitation of those clients had a direct impact of Joseph's clientele, *i.e.*, their resolve to renew their commitment to O'Laughlin and follow him to his new practice when it opened in 2019. Again, still mindful of the premium that Joseph paid O'Laughlin for the clinic's goodwill and an unhindered opportunity to retain its customers, the greater injury resulting from a denial of injunctive relief is patent. **See Morgan's Home Equipment Corp**, **supra** at 846. ("covenants not to compete which are ancillary to the sale of a business serve a useful economic function . . . [w]ere the seller free to re-enter the market, the buyer would be left holding the proverbial empty poke").

For all of the foregoing reasons, we affirm the Order granting the permanent injunction.

Order affirmed.

Judge Stabile joins the memorandum.

Judge Bowes files a concurring and dissenting memorandum.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: <u>8/22/2017</u>